SIERRA CLUB, et al., Plaintiff–Appellee,

v.

US ENVIRONMENTAL PROTECTION AGENCY, et al., Defendant,

and

City of Phoenix, Intervention–Appellant.

No. 91–16310.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1992.

Decided June 16, 1993.

Craig J. Reece, Asst. City Atty., Phoenix, AZ, for appellant.

Maria Savasta Kennedy, Sierra Club Legal Defense Fund, San Francisco, CA, for appellee.

James C. Hair, Jr., Asst. U.S. Atty., Phoenix, AZ, for defendant.

Before: BROWNING, THOMPSON and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This case has one issue, intervention as a matter of right. The Sierra Club sued the EPA under the Clean Water Act for a declaratory judgment and an injunction. The relief sought would require the EPA to change the terms of permits issued to the City of Phoenix for two of its wastewater treatment plants. The district court denied the City's motion to intervene. We reverse, and hold that the City had a right to intervene.

## I. Facts

The Sierra Club and an individual sued the Environmental Protection Agency and its administrators under the citizens' suit provision of the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act.[1] 33 U.S.C. § 1365(a)(2). The lawsuit made two claims:

1. The EPA had a duty to promulgate regulations establishing water quality standards for toxic pollutants for the State of Arizona under 33 U.S.C. § 1313(c)(4), because the state had not done so;

2. The State of Arizona was required to submit lists of impaired waters, point sources discharging pollutants into them, and control strategies to reduce such discharges, under 33 U.S.C. § 1314($l$)(1). Its

lists were insufficient under the statute, so the EPA had a duty to make a final decision on the lists, and to implement control strategies.

The prayer for relief sought a declaratory judgment and an injunction requiring the EPA to do the following:

1. promulgate water quality standards for toxic pollutants for Arizona waters under 33 U.S.C. § 1313(c);[2]

2. list impaired waters, point sources, and control strategies under 33 U.S.C. § 1314($l$), and implement the strategies "by promulgating final National Pollution Discharge Elimination System permits containing pollutant-specific, numerical, water quality-based effluent limitations that reduce toxics being discharged from each of the Arizona point sources."

The City of Phoenix[3] moved to intervene, both as a matter of right and permissively,[4] under Federal Rule of Civil Procedure 24. The district court denied the applications for lack of a "protectable interest" under *Portland Audubon Soc. v. Hodel*, 866 F.2d 302 (9th Cir.), *cert. denied*, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989), and *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1970). The complaint alleged that two wastewater treatment plants operated by the City discharged toxic pollutants, pursuant to permits,[5] into the Salt and Gila Rivers. Those rivers were impaired by pollution, so EPA had a duty to list the wastewater treatment plants as sources, and formulate individual control strategies to reduce pollution. This duty was to be performed by imposing new permit requirements on the City's wastewater treatment plants in order to meet water quality stan-

1. For those specialists who skim or do computer searches for acronyms, we note that this case involves the FWPCA, that is, the CWA, and particularly ICS's, issued pursuant to WQS's, which may affect the NPDES permits issued to WTP's.

2. Arizona has since promulgated water quality standards which have been accepted by EPA, and the Sierra Club concedes that this issue is now moot.

3. Pima County, the Arizona Mining Association, and the Stone Southwest Corporation, owner of a pulp and paper mill, also moved unsuccessfully

to intervene. The other applicants for intervention have not appealed, so we do not consider whether they were entitled to intervene as of right.

4. The district judge denied both intervention as of right and permissive intervention. Because we conclude that the City of Phoenix was entitled to intervene as a matter of right, we do not reach the issue of permissive intervention.

5. National Pollutant Discharge Elimination System (NPDES) permits issued pursuant to 33 U.S.C. § 1342.

dards. This claim was based upon 33 U.S.C. § 1314(*l*). In practical terms, the Sierra Club wanted the court to order the EPA to change the City's NPDES permits, in order to reduce the amount of pollutants from those wastewater treatment plants.

■ Our decision does not concern whether the water in the rivers falls below appropriate water quality standards, or whether the City's NPDES permits should be tightened up to reduce the amounts of toxic pollutants the City may discharge from the two wastewater treatment plants. It has to do only with whether the City of Phoenix had a right to defend the lawsuit which sought a judgment to that effect. We conclude that it did.

## II. Analysis

■ We review the district court's denial of the City's motion to intervene as of right *de novo. Scotts Valley Band of Pomo Indians v. United States*, 921 F.2d 924, 926 (9th Cir.1990). One part of the test for intervention as of right, timeliness, is reviewed for abuse of discretion. *Yniguez v. Arizona*, 939 F.2d 727, 730–31 (9th Cir.1991), *motion to dismiss as moot denied*, 975 F.2d 646 (1992).

■ The rule on intervention as of right requires that the applicant claim an interest the protection of which may as a practical matter be impaired or impeded if the lawsuit proceeds without him:

> Upon timely application anyone shall be permitted to intervene in an action: (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a). We apply a four-part test under this rule: (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action

may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action. *Scotts Valley Band*, 921 F.2d at 926. The rule is construed "broadly, in favor of the applicants for intervention." *Id.; United States ex rel. McGough v. Covington Technologies Co.*, 967 F.2d 1391, 1394 (9th Cir. 1992); *Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir.), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1982).

### A.

Timeliness is undisputed. The application for intervention was made at the outset of the litigation, before the EPA had even filed its answer. The district court did not abuse its discretion in determining that the City's application was timely. *See Yniguez*, 939 F.2d at 730–31.

The fourth element, inadequacy of representation by the existing parties, has not been put at issue. The City argues that neither Sierra Club, which seeks to alter its permits, nor EPA, which enforces the permits against the City, can be expected to represent the City's interests in the lawsuit. Sierra Club offers no argument to the contrary. The City's showing suffices on this element. *See California v. Tahoe Regional Planning Agency*, 792 F.2d 775, 778 (9th Cir.1986). *Cf. Scotts Valley Band*, 921 F.2d at 926–27.

### B.

The complaint establishes prima facie satisfaction of the second element. The complaint says that the City owns wastewater treatment plants and discharges pollutants from them pursuant to permits it holds, and those plants and permits are among the subjects of the action. But the word "interest" in the statute has been the subject of judicial interpretation requiring that the term be qualified by the adjective "protectable." The central issue in this case is whether the City's interest is "protectable." Without that, the second element cannot be satisfied.

### 1.

The requirement of "protectability" was formulated by the Supreme Court in *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1970). Donaldson had worked for a circus. The IRS issued a summons to the circus and its accountant for the circus's records relating to Donaldson's personal income taxes. Donaldson sought to intervene in the district court proceeding by which the IRS sought to enforce the summons, and ultimately lost, because he lacked a "protectable interest" in the proceeding. The Supreme Court emphasized that the IRS sought the circus's records, not Donaldson's. *Id.* at 522–23, 91 S.Ct. at 538. Donaldson did not own the records, and he had no legal privilege or other right to keep his former employer from giving them to the IRS. *Id.* at 523, 91 S.Ct. at 538. He had an interest, because the circus's records might show that he owed more tax than he had paid. But his interest was not "protectable," because the records were not his, and he had no proprietary right, evidentiary privilege, work product claim, constitutional claim to suppression, or any other right to interfere with the circus's disclosure to the IRS. *Id.* at 530, 91 S.Ct. at 542. If the circus were to give its records relating to Donaldson to the IRS voluntarily, Donaldson would have no right to suppress them. *Id.* at 531, 91 S.Ct. at 542.

We fleshed out the *Donaldson* requirement in the case of *Portland Audubon*, 866 F.2d 302. In *Portland Audubon*, environmental advocacy groups sued the Interior Department to enjoin sales of old-growth timber. The Bureau of Land Management had proposed sales, but the advocacy organizations claimed that logging the old trees would threaten the habitat of the northern spotted owl. A logging advocacy group and some logging contractors were allowed to intervene with respect to some of the claims, but not the claim under the National Environmental Policy Act ("NEPA"). They appealed the ruling that they had no right to intervene as defendants on the NEPA claim. We affirmed because the logging groups lacked a protectable interest under *Donaldson*. We followed a Seventh Circuit case, *Wade v. Goldschmidt*, 673 F.2d 182 (7th Cir.

1982) (per curiam), for the proposition that "the governmental bodies charged with compliance can be the only defendants." *Portland Audubon*, 866 F.2d at 309 (quoting *Wade*, 673 F.2d at 185).

Unlike the loggers in *Portland Audubon*, the City owns rights protected by law relating to the property which is the subject of the action. The loggers' interest in *Portland Audubon* appears to have been an economic interest based upon a bare expectation, not anything in the nature of real or personal property, contracts, or permits. The City of Phoenix, by contrast, owns the wastewater treatment plants and the permits. These interests are rights connected with the City's ownership of real property and its status as an EPA permittee. Such rights are among those traditionally protected by law, unlike the interest, for example, of the former circus employee in *Donaldson* in preventing financial disclosures by his former employer to the IRS. The lawsuit seeks relief which would require changes in the City's permits, making them more restrictive of City discharges from the plants.

■ We need not decide in this case whether a lesser interest would suffice, because the property rights and permits owned by the City are sufficient to distinguish *Donaldson* and *Portland Audubon*. In some contexts, we have determined that interests less plainly protectable by traditional legal doctrines sufficed for intervention of right. *Cf. Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627 (9th Cir.) (intervention as of right by advocacy group which had sponsored antinuclear statute in suit challenging that statute), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1982); *Idaho v. Freeman*, 625 F.2d 886 (9th Cir.1980) (intervention as of right by National Organization of Women in suit challenging the procedures for ratification of the proposed Equal Rights Amendment); *Sagebrush Rebellion v. Watt*, 713 F.2d 525 (9th Cir. 1983) (intervention as of right by National Audubon Society in suit challenging creation of conservation area); *Yniguez v. Arizona*, 939 F.2d 727 (9th Cir.1991) (intervention as of right by sponsors of ballot initiative declaring English to be the official language in

litigation challenging the constitutionality of that statute), *motion to dismiss as moot denied,* 975 F.2d 646 (1992). In the case before us, though, the lawsuit would affect the use of real property owned by the intervenor by requiring the defendant to change the terms of permits it issues to the would-be intervenor, which permits regulate the use of that real property. These interests are squarely in the class of interests traditionally protected by law.

### 2.

*Portland Audubon* suggests an additional aspect of protectability with its comment that the loggers' interests "ha[d] no relation to the interests intended to be protected by the statute at issue—in this case, NEPA." *Portland Audubon,* 866 F.2d at 309. Sierra Club argues for a very broad application of this relationship requirement to exclude potential intervenors. Its brief argues that the City's interest in discharging pollutants is contrary to the purpose of the Clean Water Act, and *Portland Audubon* bars intervention because the Clean Water Act does "not protect the economic or proprietary interests of polluters." For that reason, "[t]he fact that the City may be required to expend funds to reduce toxic discharges into the Gila and Salt Rivers is not ... relevant." Intervention under the Clean Water Act, Sierra Club contends, is limited to "environmental interests, not economic interests."

 When one keeps in mind that the issue is participation in a lawsuit, not the outcome, this reading of *Portland Audubon* is more than a little surprising. After all, even admitted tort-feasors may be heard in tort cases, breakers of promises in contract cases, and trespassers in property cases. In matters of public law, copyright infringers may be heard in copyright cases, tax evaders in tax cases, and racketeers in RICO cases, whether civil or criminal. Their interests are assuredly not those protected by the statutes at issue in those cases, but the adversary process can function only if both sides are

heard. So why should polluters in environmental cases be excluded from participation in lawsuits which will affect their property and permits? Sierra Club concedes that the City of Phoenix may be required to spend its citizens' money on account of the remedies sought in the lawsuit, and apparently concedes that its lawsuit may compel EPA to change the terms of the City's NPDES permits. The objection to the City's participation in the lawsuit seems to be that it is on the wrong side, the polluters' side. Our adversary process requires that we hear from both sides before the interests of one side are impaired by a judgment. *Portland Audubon* does not create an exception for polluters.

The requirement of relationship to the interests protected by the statute was articulated by *Portland Audubon* in the course of distinguishing two cases which supported intervention as of right, *County of Fresno v. Andrus,* 622 F.2d 436 (9th Cir.1980), and *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525 (9th Cir.1983). The language—"ha[d] no relation to the interests intended to be protected by the statute at issue"—is the basis for Sierra Club's argument that those whose interests would undermine the anti-pollution purposes of the Clean Water Act cannot intervene as of right. But this broad reading of *Portland Audubon* cannot be correct, because it would cause *Portland Audubon* to be in conflict with the cases it purports to distinguish, and with numerous other cases we have decided.[6]

In *County of Fresno,* a group of farmers sought issuance of regulations to protect their interests under the Reclamation Act. The County sued to delay issuance of the regulations until an environmental impact statement was prepared. The case came to us on the district court's denial of the farmers' motion to intervene in the County's case. We reversed, and held that the farmers' group was entitled to intervention as of right, because their interests were precisely those that Congress meant to protect under the

---

**6.** The broad reading might also bring us into conflict with the Eleventh Circuit, which decided an analogous issue in *United States v. South Florida Water Management District,* 922 F.2d 704 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 407, 116 L.Ed.2d 356 (1991). Our decision avoids an intercircuit conflict.

Reclamation Act. The *County of Fresno* case cannot mean that the interest of the proposed intervenor must be protected by the statute under which the lawsuit is brought, because the farmers' interests were not protected by the statute relied upon by the County, NEPA. The farmers' interest was protected by a statute other than the one put at issue by the complaint, and the relief they sought was not congruent with the policy of the statute pursuant to which the County sought relief.

In *Sagebrush Rebellion Inc.,* the Secretary of the Interior had withdrawn 500,000 acres of land from entry under the Desert Land Act, 43 U.S.C. § 321 *et seq.,* and the Carey Act, 43 U.S.C. § 641. Opponents of the withdrawal sued, claiming that the withdrawal violated the Federal Land Policy and Management Act, 43 U.S.C. § 1714. The withdrawal was contrary to the purpose of the Desert Land Act and the Carey Act, facilitating reclamation and settlement of desert lands. *Sagebrush Rebellion,* 713 F.2d at 526, n. 1. We held that the Audubon Society's interest was "protectable." *Id.* at 528. Yet the interests represented by the Audubon Society were adverse to those protected by the statutes put at issue by the plaintiffs' lawsuit. The Audubon Society wanted the land withdrawn for a bird sanctuary, but the intervenors wanted the land open for reclamation.

We rejected, in *Sagebrush Rebellion,* the proposition that "the intervenor's interest . . . [is] measured in relation to the particular issue before the court at the time of the motion and not in relation 'to the subject of the action,' as provided in Rule 24." *Id.* at 528. Yet that proposition, explicitly rejected in *Sagebrush Rebellion,* is necessary to Sierra Club's argument in the case at bar. *Sagebrush Rebellion* can be reconciled with *Portland Audubon* by considering the words in *Portland Audubon,* "ha[d] no relation to the interests intended to be protected by the statute at issue." *Portland Audubon,* 866 F.2d at 309 (emphasis added). In *Sagebrush Rebellion,* the intervenors' interest was not protected by the statutes which the complaint put at issue, but it was protected by

law and had a relation to the interests at issue.

We have a substantial body of precedent irreconcilable with the reading of *Portland Audubon* urged by Sierra Club. In *Scotts Valley Band,* 921 F.2d 924, a tribe sued to have land restored to federal trust status, claiming that the government unlawfully terminated such status under the California Rancheria Act. We held that a city currently taxing and regulating some of the land could intervene as of right, because it had a significant "protectable" interest in collecting property taxes and imposing land use, health, and safety regulations on the land in question. We gave no consideration to whether the city's interests were protected by the California Rancheria Act, the statute under which the litigation was brought.

In *United States v. Oregon,* 745 F.2d 550 (9th Cir.1984), the United States and the Yakima Indian Nation sued Oregon to define Indian treaty rights to fish in the Columbia river and its tributaries. We held that Idaho had a sufficient interest for intervention as of right, because fishing by the tribe could affect Idaho fishermen. *Id.* at 553. We did not consider whether the Yakima treaty was intended to protect Idaho fisherman.

In *Washington State Bldg. & Constr. Trades Council,* 684 F.2d at 630, we held that an advocacy group opposed to radioactive waste in Washington could intervene as of right in litigation challenging a Washington statute which prohibited the transportation and storage of radioactive waste in that state. The plaintiffs were suing under the Atomic Energy Act, and although there was no suggestion that the interests of the advocacy group were protected under that Act, we nonetheless held that the group was entitled to intervene as of right.

■ We ordinarily do not require that a prospective intervenor show that the interest he asserts is one that is protected by the statute under which the litigation is brought. It is generally enough that the interest is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue.

### 3.

*Portland Audubon* is most plainly distinguished from and reconciled with these cases by understanding it as a NEPA case. In NEPA cases, interests which might be protectable in other litigation contexts may not suffice for intervention as a defendant under *Portland Audubon.* NEPA does not regulate the conduct of private parties or state or local governments. It regulates the federal government. NEPA requires the federal government to issue an environmental impact statement before taking any action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Since NEPA requires only action by the government, no private party can comply with NEPA. It is for that reason that in a lawsuit to compel compliance with NEPA, no one but the federal government can be a defendant. This is the requirement of *Wade v. Goldschmidt,* 673 F.2d 182, followed in *Portland Audubon.* The loggers in *Portland Audubon* had an interest in securing timber, but no existing legal right to it, and an injunction requiring the Bureau of Land Management to issue an environmental impact statement regarding the timber sale would not by its terms prevent or change the terms of the timber sale.

The case at bar is different because it is brought under the Clean Water Act. 33 U.S.C. §§ 1251 *et seq.* The Clean Water Act does not principally regulate the EPA. It regulates private parties and state and local governments, such as the City of Phoenix. 33 U.S.C. § 1311(a) (discharge "by any person" without a permit generally prohibited). In the case before us, the compliance must ultimately be by the City of Phoenix and other parties regulated by the Clean Water Act. EPA is not the discharger of pollutants from the wastewater treatment plants. More restrictive NPDES permits, sought by the lawsuit, will require remedial conduct by the City of Phoenix. It is one thing to hold that only the government can be a defendant in a NEPA suit, where the statute regulates only government action, but quite another to exclude permit-holding property owners from a Clean Water Act suit, where the statute directly regulates their conduct.

In a NEPA case, a private interest is unprotectable in the same sense as in *Donaldson,* the circus employee case. In *Donaldson,* the would-be intervenor expected to be financially worse off if the plaintiff won the lawsuit, but that was insufficient for intervention, because the law did not protect his financial interest, and he had no interest protected by any law which related to the matter at issue. Likewise, in a NEPA case, someone who will be economically worse off if an environmental impact statement precedes a major government action nevertheless has no interest protected by law in defending against issuance of an environmental impact statement.

### 4.

*Donaldson* requires that the interest of a would-be intervenor be protected by some law and related to the subject of the litigation. In this case the law protecting the City's interest is the Clean Water Act itself. The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). But the statute also explicitly provides for discharge permits. *E.g.,* 33 U.S.C. § 1342. The statute establishes a scheme, applicable to many municipal water treatment plants, explicitly designed to permit and thereby regulate the discharge of sewage sludge into the navigable waters of the United States. 33 U.S.C. § 1345(a).

The various discharges produced by human activities must go somewhere, into the water, the soil, or the air, after purification processes of varying effectiveness and cost with by-products of their own. Pollution imposes costs on third parties, and prevention imposes costs on polluters, which costs may burden the rest of our society. The Clean Water Act deals with the unfortunate inevitability of pollution, and shifts costs from third parties to polluters, by allowing pollution only pursuant to a permit. The legitimate interests of persons discharging permissible quantities of pollutants pursuant to NPDES permits are explicitly protected by the Act. 33 U.S.C. § 1342. Because the Act protects the interest of a person who

discharges pollutants pursuant to a permit, and the City of Phoenix owns such permits, the City has a "protectable" interest. These permits may be modified by control strategies issued as a result of this litigation, so the City's protectable interest relates to the litigation.

The City also has a protectable interest with respect to the compilation of lists of problem waters, and to the identification of point sources. Once the lists are compiled and the point sources identified, control strategies will be required for waters which fail to meet water quality standards "due entirely or substantially to discharges from point sources of any toxic pollutants." 33 U.S.C. § 1314(*l*)(1)(B) ("B" list waters). The obligation to implement control strategies is triggered by the compilation of the problem water lists and the identification of point sources, so an adjudication on these issues could "result in practical impairment of the [City's] interests." *Yniguez,* 939 F.2d at 735. Waters affected by City discharges may be listed. Therefore, the City has a sufficient interest as to all of the remaining issues raised in the underlying litigation.

### C.

The third element of intervention as of right, impairment, follows from the factors discussed above. The Sierra Club argues that to the extent the relief it seeks may affect the City, the City could protect its interests in subsequent administrative or judicial proceedings, so the City's interests would not be impaired by this litigation. But the relief sought by the Sierra Club would constrain the EPA, which would not then be free to violate the terms of the declaratory and injunctive relief in later administrative proceedings. *Legal Aid Society of Alameda County v. Brennan,* 608 F.2d 1319, 1328 (9th Cir.), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1979); *United States v. South Florida Management Dist.,* 922 F.2d 704, 708–09 (11th Cir.1991). The City could not use its appeal of its NPDES permits to put at issue the extent of the EPA's regulatory duties. *Trustees for Alaska v. Environmental Protection Agency,* 749 F.2d 549, 558–559 (9th Cir.1984). The case at bar

would have controlling force on those issues. Although the City might challenge various determinations in separate proceedings, those proceedings would be constrained by the *stare decisis* effect of the lawsuit from which it had been excluded. *United States ex rel. McGough,* 967 F.2d at 1396. The order sought by Sierra Club would require modifications to the City's NPDES permits to the extent that they were inconsistent with water quality standards promulgated as a result of this case. Once the permits had been modified, the City would have little but an argument in the subsequent administrative proceedings about whether the narrowed NPDES permits for its water treatment plants were needed to comply with the constraints established by the case at bar. The relief sought in Sierra Club's lawsuit would necessarily "result in practical impairment of the [City's] interests." *Yniguez,* 939 F.2d at 735.

REVERSED and REMANDED.